Judgment rendered April 26, 2023.
Application for rehearing may be filed
within the delay allowed by Art. 2166,
La. C.C.P.

No. 55,132-CA

COURT OF APPEAL
SECOND CIRCUIT
STATE OF LOUISIANA

* * * * *

WHITNEY LEO TRIPP                          Plaintiff-Appellant

versus

GEISHA NATHALIEE                           Defendant-Appellee
GUITERREZ GENER

* * * * *

Appealed from the
Twenty-Sixth Judicial District Court for the
Parish of Webster, Louisiana
Trial Court No. 79,732

Honorable Robert Lane Pittard, Judge

* * * * *

KITCHENS LAW FIRM                          Counsel for Appellant
By: Paul Edward Kitchens
    Graydon K. Kitchens, III
    P. Nelson Smith, Jr.

MARK J. MICIOTTO                           Counsel for Appellee

* * * * *

Before PITMAN, COX, and MARCOTTE, JJ.

**COX, J.**

This custody dispute arises out of the Twenty-Sixth Judicial District Court, Webster Parish, Louisiana. Whitney Leo Tripp and Geisha Gener were ordered to alternate custody of their minor child, B.T., every six months. Mr. Tripp now appeals. For the following reasons, we affirm the ruling of joint custody, respectfully vacate the trial court's judgment regarding the visitation schedule, and remand for further proceedings.

## FACTS

Mr. Tripp and Ms. Gener were married on March 29, 2018, in Claiborne Parish and moved to Miami, Florida, in September of that year. On January 14, 2019, their only child, B.T., was born. On May 12, 2021, Mr. Tripp moved from Miami to Sarepta, Louisiana, with B.T. The couple separated on November 29, 2021.

On December 20, 2021, Mr. Tripp filed a "Petition For Ex Parte Order of Temporary Custody, Petition for Divorce 102 and for Determination of Incidental Matters." He alleged that since moving back to Louisiana, Ms. Gener had only visited the child on four occasions and the last visit was on November 22, 2021. He alleged that Ms. Gener was planning to take B.T. with her to Colombia and feared irreparable injury, loss, or damage if a temporary restraining order was not granted to prevent B.T. from being removed from the trial court's jurisdiction.[1] Mr. Tripp requested emergency, temporary sole custody of B.T., a temporary injunction preventing Ms. Gener from removing the child from the jurisdiction, and a mental health

---

[1] Ms. Gener is from Venezuela, but Mr. Tripp and Ms. Gener had previously met her family in Colombia to visit.

professional be appointed to render a report as to what custodial arrangement would be in the best interest of the child.

On January 14, 2022, Ms. Gener filed her answer. She stated that it was in the best interest of the child for her to be awarded sole custody. She alleged Mr. Tripp was verbally abusive as he used foul or improper language in the presence of or directed to the minor child, which is harmful to her emotions, health, and welfare. She stated that due to Mr. Tripp's business, he was frequently out of the country and she provided the sole care of the child. She asserted that Mr. Tripp took the child for a temporary stay in Webster Parish, Louisiana, to care for an ailing parent, against her wishes. Ms. Gener alleged that Mr. Tripp was engaging in numerous affairs with several women outside of the U.S. and that type of environment was not in the child's best interest. Ms. Gener requested the trial court establish a custody arrangement in which the child primarily resided with her, a holiday schedule, child support, and permission to move the child back to Miami.

The first interim custody order was signed on January 28, 2022, and stated the following: Louisiana is deemed the home state for these proceedings; the child shall remain in Louisiana in the physical custody of Mr. Tripp; Ms. Gener's visitation/physical custody is to be exercised within Caddo, Bossier, and Webster Parishes; Ms. Gener was granted five days of physical custody each month; Mr. Tripp is to pay for Ms. Gener's airfare each month; and Mr. Tripp's request for a mental health professional was denied.

On May 11, 2022, the child custody proceedings commenced and the following witnesses testified. First to testify was Kimberly Hutchinson, the assistant director of B.T.'s preschool, North Webster Children's Learning Center ("North Webster"). She testified that B.T.'s first day at North Webster

2

was on June 9, 2021. Ms. Hutchinson stated that when B.T. arrived, she was not potty trained; there was a communication barrier because she did not speak English; and their primary form of communication was pointing to objects or physically showing B.T. what to do. She testified that by January 6, 2022, B.T. was potty trained, speaking fluent English, and could count to 20 in English.

Ms. Hutchinson testified that whenever B.T. is out for a visit with her mom, she comes back with disciplinary issues, throwing fits, and yelling at other children. She stated that when B.T. gets upset, she hits toys, tables, and shelves and throws herself down, even if it is on concrete. She stated that these issues resolve after a few days.

Jeremy Box, Mr. Tripp's brother-in-law, testified that he has observed Mr. Tripp's relationship with B.T. Mr. Box stated that he has been married to Mr. Tripp's stepsister for four years and has known Mr. Tripp since that time. He stated that he has seen B.T. and Mr. Tripp playing together, Mr. Tripp takes good care of B.T., and he has no reason to be concerned about B.T.'s safety while in the care of Mr. Tripp. On cross-examination, Mr. Box stated he did not know Mr. Tripp's occupation, did not consider Mr. Tripp a close friend, and did not know much about him or his personal life. He stated that he did witness B.T. having "out of control" and "wild" tantrums after visits with her mom.

Paula Wright, Mr. Tripp's mother, testified that she has had an extensive career in elementary education. She stated that when B.T. arrived in Louisiana, she was drinking bottles of milk but not eating. She stated that Mr. Tripp took B.T. off the bottle and had her eating food not long after arriving. Mrs. Wright testified that she was concerned about B.T. when she

3

arrived because she could not speak English.  She stated, "And she couldn't –
she would just jabber.  She wouldn't talk.  She wasn't speaking Spanish… but
she immediately started picking [English] up after she began schooling and
talking with [them] every day."

Mrs. Wright testified that B.T. was not potty trained when she arrived
but Mr. Tripp potty trained her.  She stated that Mr. Tripp gives B.T. her
baths, cooks her meals, packs her school lunch, puts her to bed each night,
does all of her shopping, buys her Christmas presents, and attends B.T.'s
school and church activities and programs.  When asked if she had observed
B.T.'s behavior after visits with her mom, Mrs. Wright responded:

> B.T., when she comes back, is sometimes defiant.  Just based on
> when I am seeing them together at my home over this past year, I
> know that she had no control over B.T.  B.T. will yell at her and
> hit at her, and she doesn't stop her or correct her.  But at our
> house, she knows the rules, but when she comes back, it's as if
> she's got to learn the rules again.

Mrs. Wright testified that she has not seen anything that would cause
her to be concerned about B.T.'s health and safety while in Mr. Tripp's care.
She stated, "I work with parents every day, speak with parents on a daily
basis, and I've never seen anyone more dedicated than my son has been to
B.T.  Ever."

Mr. Tripp testified that shortly after arriving in Louisiana in May 2021,
he and Ms. Gener exchanged text messages discussing divorce.  He stated that
he has taken B.T. to the doctor regularly since coming to Louisiana and she
was up-to-date on her shots when they arrived.  He testified that he has had
conversations with Ms. Gener about her moving and she told him she was not
leaving Miami and her professional licenses will not transfer to Louisiana.
Mr. Tripp stated that he takes B.T. to North Webster, packs her lunches,

4

cooks her dinner, gives her baths, does her laundry, takes her to church, and takes her out for fun activities. During his testimony, the parties stipulated that Mr. Tripp takes good care of B.T.'s hygiene.

Mr. Tripp testified that when they were living in Miami, the only English-speaker B.T. was exposed to was him, she attended a Spanish-speaking daycare, and all of the people she was around outside of the home spoke Spanish. He stated that B.T. was not fluent in Spanish and "she wasn't using any type of words. It was garble I guess you could say." He testified that since coming to Louisiana, he has worked with her and she has had a dramatic improvement in her language skills. He stated, "[M]y personal opinion is she is extremely intelligent, and her verbiage is exceptional now."

Mr. Tripp testified that when they were living in Miami and he was out of town on business, Ms. Gener would take B.T. to daycare around 8 or 8:30 a.m. and not pick her up until 6:30 p.m. when the center closed. He stated that the evening commute from the daycare to their condo at that time was over an hour. He stated that Ms. Gener would take B.T. to a babysitter on Saturdays and Sundays when he was out of town, even though she was off on Sundays. Mr. Tripp recalled the following two instances in which Ms. Gener was not properly supervising B.T.: Ms. Gener left B.T. alone inside a hotel lobby and B.T. walked almost to the road at the house in Sarepta when she was left alone with Ms. Gener.

During Mr. Tripp's testimony, the parties stipulated that they would use the Family Wizard app for communication between the parents. Mr. Tripp requested that the court consider Webster Parish's year-round school schedule when determining the custody arrangement and order drug screens of both of

them.[2]  He testified that he is aware of Ms. Gener taking Tramadol without a prescription.  He stated that he was recently prescribed Adderall.

Mr. Tripp testified that he is very involved in his older children's lives; his daughter is 22 years old and his son is 20 years old.  Regarding his marriage with Ms. Gener, he stated that they had not been intimate since before B.T. was born because he lost trust in her.  He testified that Ms. Gener took money designated to help her family in Venezuela and used it for lap band surgery in Venezuela.  He stated that they were in the process of getting her American citizenship but were under a three-year probationary period of the marriage.  He stated that he filed for divorce and was uncomfortable lying to federal officers about their marriage.  He testified that he does not know the current citizenship status of Ms. Gener.

Mr. Tripp testified that he has had one brief relationship with another woman after B.T.'s birth, but he is not currently dating anyone.  Mr. Tripp testified that he stepped away from his career goals in order to bring his daughter around a loving, secure, structured, family environment.  He stated that everything he does is centered around B.T. and he puts her before himself.

During cross-examination, transcripts from Mr. Tripp's second divorce were entered into evidence in which the trial judge stated that Mr. Tripp stretched "the limits of credulity."  Mr. Tripp admitted to having an affair with a woman in Costa Rica while he was married to Ms. Gener.  He stated

---

[2] The court ordered the drug screens to occur during the lunch break, but before the lunch break, the parties mutually agreed to withdraw the drug screen request and order.

6

that the last time he filed taxes was in 2018 and he has a CPA working on his 2019, 2020, and 2021 taxes.[3]

Mr. Tripp testified that the longest he has lived in the same city since leaving home at 18 years of age is four years, although he did spend about ten years living in different parts of North Louisiana. Mr. Tripp stated that Ms. Gener likely would not have allowed him to take B.T. to Louisiana had she known that they would not be returning. He stated that since Ms. Gener began her week-long visits with B.T., as allowed by the court, he has gone on cruises for business purposes during two out of the four visits. He testified that he will likely need to be out of the country more if he expands his business to Cozumel.

Mr. Tripp testified that he intends to enroll B.T. in Webster Parish Schools when she begins kindergarten. He stated that he did not attend church while in Miami, but since coming to Louisiana, he and B.T. attend church with his family. When questioned, Mr. Tripp stated that he was not concerned with B.T. being hungry or not having adequate clothing while in Ms. Gener's care. When further questioned by the court, he stated that he is worried about Ms. Gener using medications without a prescription. During that colloquy between the court and Mr. Tripp, the court stated that it seemed as though Mr. Tripp alienated B.T. from Ms. Gener by bringing her to Louisiana. Mr. Tripp replied that Ms. Gener could visit B.T. as often as she wanted, and he purchased the plane tickets for the trips she did make to Louisiana.

---

[3] Mr. Tripp's business, Island Wifi, is incorporated in the Bahamas and provides wifi boxes to tourists in the Bahamas and on cruise ships. He is the sole owner of Island Wifi.

When directly asked by the court what kind of custody he wanted, Mr. Tripp stated that he wanted custody of B.T., but she could visit her mom in the summer and alternate holidays. He admitted that it would be "extremely difficult… to spend equal amounts of time with her for her development right now." He stated that he felt Louisiana was the safest place for B.T.

Osvell Pitterr, a long-time friend of Ms. Gener, testified that he has known Ms. Gener since they went to school together in Venezuela. He stated that he has been living in Miami for 20 years. He stated that he met Mr. Tripp in Miami when Mr. Tripp was planning to visit Ms. Gener in Venezuela. Mr. Pitterr testified that Mr. Tripp invited him to the Bahamas to stay in his (Mr. Tripp's) apartment there, but Mr. Tripp later admitted to him that the apartment belonged to his father. He stated that after Ms. Gener became pregnant, Ms. Gener and Mr. Tripp moved in with him until B.T. was born and they moved into their apartment. Mr. Pitterr testified that Mr. Tripp told him multiple times that he wanted to live in another country like Costa Rica or Peru because it was cheaper than the United States.

Mr. Pitterr testified that neither parent was a bad parent and both loved B.T. He stated that B.T. was with them equally when he would visit their apartment in Miami. He testified that he was not surprised that Mr. Tripp left Miami with B.T. because he always talked about moving from Miami.

Rafael Rodriguez, Ms. Gener's cousin, testified that he is originally from Venezuela but has lived in Miami for just over four years. He stated that he met Mr. Tripp when Ms. Gener was pregnant with B.T. Mr. Rodriguez testified that when he asked Ms. Gener about B.T., she would tell him that B.T. was with her dad and would be coming back to Miami. He stated that Ms. Gener is a good cook and cooks for B.T. and everyone else.

8

Ms. Gener was the last to testify and had the assistance of an interpreter. She stated that she is living in a good, safe area of Miami. She testified that she is currently an aesthetician and tattoo artist, and has a long list of certifications, which were introduced into evidence. Ms. Gener stated that while in Venezuela, she attended what is called a medical school, was a bioanalyst in a lab, and her primary job was to perform blood tests for cholesterol, triglycerides, etc. She testified that she now has her own spa business in Miami and is able to make her own schedule when she has B.T.

Ms. Gener testified that she met Mr. Tripp on "Latin America Cupid" in July 2017, and they were married on March 29, 2018. She admitted to taking Tramadol without a prescription for back and stomach pain but does not currently take it because she no longer needs it. When asked about Mr. Tripp, she stated that he is a good father and she agreed that he could take B.T. to Louisiana for a two-week visit in May 2021. She testified that she asked Mr. Tripp on multiple occasions when he would be bringing B.T. back to Miami, and he would tell her it would be a little more time or he needed to take care of a few more things in Louisiana first. It was not until October or November 2021 that she realized he was not bringing B.T. back to Miami. She stated that based on video calls with B.T., she is concerned that Mr. Tripp is giving B.T. too much fast food and chocolate.

When asked by the court what custody arrangement she requests, Ms. Gener stated that she wanted custody of B.T., Mr. Tripp can visit whenever he wants, and Mr. Tripp can have B.T. for holidays and vacations. She testified that she did not have any objections to B.T. visiting Mr. Tripp in Louisiana but does not want B.T. confused by changing homes every six months.

Ms. Gener testified that she did not attend church while married to Mr. Tripp. However, she stated that before their marriage, she attended a Catholic church in Venezuela and after he left Miami, she began going to mass at a Catholic church close to her home. She testified that she has had conversations with Mr. Tripp about her desire to have B.T. baptized in the Catholic church. Ms. Gener testified that she received pictures from Mr. Tripp of B.T. in her school and church activities, and although she knew when some would occur, he did not invite her to attend.

When asked about her status in the U.S., Ms. Gener testified that she has an immigration lawyer and is waiting for her permanent residence. Ms. Gener stated that although she is allowed to be here with her temporary residence, she is still technically a citizen of Venezuela.

After the custody proceedings, the trial court rendered its judgment in open court on May 13, 2022. The interim order memorializing the ruling was signed on June 20, 2022, and stated the following: the child's passport would be held under seal with the court and could only be removed upon consent of both parties; the three-parish boundary for Ms. Gener's visitation was removed; Mr. Tripp was given physical custody of the child until June 30, 2022; Ms. Gener was given physical custody from July 1, 2022, until the next hearing on August 2, 2022; and each party was given the right to visit on weekends during the other party's custody, provided a one-week notice was given.

The trial court's written opinion was filed June 13, 2022. The trial court stated the following regarding La. C.C. art. 134 best interest of the child factors (hereinafter referred to as "Article 134 factors"):

1. Potential for abuse: It was agreed that there was no evidence of abuse.

2. Love, affection, and emotional ties between parent and child: Both parties equally showed love, affection, and other emotional ties to the child.

3. Capacity and disposition of each party to give love, affection, and spiritual guidance and to continue the education and rearing of the child: Mr. Tripp testified that although he did not attend church in Miami, he attends each Sunday with B.T. in Webster Parish. Mr. Tripp prepares B.T.'s lunches, buys her clothes, cooks for her, provides her medicine, takes her to doctor visits, and dresses and bathes her each day. B.T. moved from a predominantly Spanish-speaking daycare in Miami to an English-speaking daycare in Webster Parish. "[B.T.] needs to be educated in both English and Spanish to communicate with her family."

4. Capacity and disposition to provide the child with food, clothing, medical care, and other needs: Ms. Gener has a "budding, but successful small business" in the health and beauty industry and produced her federal tax returns for the previous year. Mr. Tripp's business is incorporated in the Bahamas and he has not filed his income taxes for the past five years. Mr. Tripp works from home, but his work frequently takes him out of the country, which is often on cruise ships. He is currently in litigation with AT&T, which is one of his principal associates in the business. Mr. Tripp has been married three times. He has two children from his first marriage. No records from the proceedings with his first wife were filed in the instant case. Mr. Tripp testified that he went approximately two years without seeing his first two children and his first wife sued him for child support. In proceedings from his second divorce, the judge over that matter indicated that Mr. Tripp was not credible in his testimony regarding an adulterous relationship. Mr. Tripp is still in litigation in Lincoln Parish with his second wife over community property.

5. Length of time the child has lived in a stable, adequate environment, and the desirability of maintaining that environment: Mr. Tripp lives in a home with his mother, stepfather, and B.T. Mr. Tripp never disclosed his intentions to Ms. Gener that he would not be bringing B.T. back to Miami and was going to seek a divorce and legal custody of B.T. "The court also finds it suspect that no legal action was taken until after the six (6) month period necessary to obtain jurisdiction in Louisiana had lapsed." The time B.T. spent living in Louisiana under the ex parte custody order is not held against Ms. Gener because "the circumstances of it being granted is questioned by this court." Ms. Gener lives in the couple's apartment, but she has agreed to relocate in Miami.

6. The permanence, as a family unit, of the existing or proposed custodial home, or homes: "See the answer to factor number five."

7. Moral fitness of each party: Although the parties were told the court only wanted to hear about moral fitness insofar as it affects the welfare of the child, each party presented additional evidence outside the scope. Ms. Gener presented evidence of Mr. Tripp's affairs during his first two marriages as

well as their marriage. Mr. Tripp offered photos of Ms. Gener's attire, but he then admitted to buying the dress she was wearing in the photo.

8. History of substance abuse, violence, and criminal activity: No evidence.

9. Mental and physical health of each party: No evidence.

10. Home, school, and community history of child: Because of the child's age and circumstances in moving from Miami to Louisiana, "there is no significant history to consider."

11. Preference of the child: Not of age to express.

12. Willingness and ability to facilitate relationship with the other parent: Mr. Tripp does not appear willing to help facilitate and encourage a relationship between B.T. and her mother. Ms. Gener appeared to encourage B.T. to have a relationship with her father and has not impeded the relationship.

13. Distance between the residences: They live over 1,000 miles apart, which was caused by Mr. Tripp's decision to move to Louisiana (even though he works remotely and most of his business activity is in Florida or the Bahamas). B.T. should not be burdened by traveling such a far distance many times a year that would not be necessary if the parties lived in close proximity.

14. Responsibility of care and rearing of child: As Mr. Tripp speaks limited Spanish and B.T. was primarily speaking Spanish when she got to Louisiana, she would have learned her language from her mother. However, Mr. Tripp has been a "stellar parent" while having B.T. in his sole care, but "the court believes that he knew that these would be issues in the child custody proceeding."

The trial court elaborated on the custody arrangement as follows: B.T. will live with Mr. Trip from the beginning of the year until June 30 and with Ms. Gener from July 1 through the end of the year; B.T. will have a week of Thanksgiving with Mr. Tripp and Christmas with Ms. Gener; the holiday schedule will reverse the next year. The trial court heard limited testimony regarding where the child will attend school. Therefore, the trial court stated that the parents could petition the court for a further determination of custody when B.T. reaches "the age of mandatory public-school education."

The trial court's August 30, 2022 Judgment adopted its written opinion, stated the parties would be granted joint custody of B.T., and detailed the

12

alternating six-month visitation schedule, with Thanksgiving and Christmas alternating each year. These custody provisions are deemed to be a final judgment on the issue of custody and visitation.

On September 1, 2022, Mr. Tripp filed his motion for new trial asserting the trial court improperly granted shared custody of B.T. He also asserted that he has the following new evidence that he would not have been able to obtain prior to trial: Mississippi child support records; Louisiana child support records; proof of relocation to a new residence by Ms. Gener; and proof of Ms. Gener's use of a prohibited drug. He states that Ms. Gener works on Saturdays and Sundays and takes B.T. with her to work. He argues that his relationship with B.T. has "suffered tremendously" since being with her mother in Miami. He claims that since B.T. went back to Miami, his communication with B.T. is limited, Ms. Gener oversees their conversations, Ms. Gener does not remove distractions during phone calls, and there is no structure to allow for meaningful conversations. He also complained that he is financially unable to visit B.T. while she is in Miami because hotels are $500 per night in addition to the other travel expenses. Mr. Tripp requested a new trial regarding custody.

Ms. Gener opposed the motion for new trial arguing that it does not conform to the language mandated by La C.C.P. art. 1975. She asserted that Mr. Tripp's allegations do not merit a change in the trial court's ruling. She argued that Mr. Tripp only wants a second bite at the apple and should be denied based on form alone. If he is not denied for form, she asserts he should be denied because his "new" evidence does not meet the standard to support a motion for new trial.

13

On November 28, 2022, the trial court signed its judgment denying Mr. Tripp's motion for new trial. Mr. Tripp now appeals.

**DISCUSSION**

*Shared Custody & Domiciliary Parent*

Mr. Tripp argues the trial court erred in awarding shared custody without consideration of the distance between the parties. Mr. Tripp cites cases where Louisiana courts have found an abuse of discretion when parties live a substantial distance from each other and are awarded shared custody. He asserts that based on the facts and jurisprudence, it is in the best interest of B.T. to be placed in his primary care in Louisiana, with reasonable visitation for Ms. Gener.

Mr. Tripp argues the trial court erred in failing to name him as primary domiciliary parent. He contends that if the evidence presented had been appropriately weighed according to the Article 134 factors, the only reasonable outcome would have been for the trial court to grant joint custody of the minor child and designate him as the domiciliary parent. He requests this court reverse the trial court's judgment.

Ms. Gener asserts that the following Article 134 factors are clearly weighed in her favor: 3- continuing the education and rearing of the child; 5- stability, adequacy, desirability, and continuity of environment; 6- permanence of custodial home; 7- moral fitness; 9- mental health; 10- home, school, and community history of the child; and 11- willingness and ability to foster and encourage a close relationship between the child and the other party. She argues that the other factors are neutral, with none falling in Mr. Tripp's favor. She asserts that if a domiciliary parent is named, she should be designated the domiciliary parent.

14

Underlying the trial court's great discretion in child custody cases is its opportunity to better evaluate the credibility of witnesses. Accordingly, the trial court's determination of custody issues is afforded great weight and will not be disturbed on appeal absent an abuse of discretion. *Colvin v. Colvin*, 40,518 (La. App. 2 Cir. 10/26/05), 914 So. 2d 662.

In a proceeding for divorce or thereafter, the court shall award custody of a child in accordance with the best interest of the child. La. C.C. art. 131. Louisiana Civil Code Article 134 lists 14 factors to be considered in determining the best interest of the child.

Subject to the provisions of R.S. 9:364, in the absence of agreement, or if the agreement is not in the best interest of the child, the court shall award custody to the parents jointly; however, if custody in one parent is shown by clear and convincing evidence to serve the best interest of the child, the court shall award custody to that parent. La. C.C. art. 132. In a proceeding in which joint custody is decreed, the court shall render a joint custody implementation order except for good cause shown. La. R.S. 9:335(A). Substantial time rather than strict equality of time is mandated by the legislative scheme providing for joint custody of children. *Colvin, supra*.

The trial court took great care in analyzing the Article 134 factors in its written reasons for judgment, as detailed above. A review of the Article 134 factors indicates that both parents are equal in most respects and both are capable and loving parents. However, an equal sharing of custody is prevented by the distance between the parents' homes. In many situations, courts have found alternating custody arrangements were not in the best interest of the children involved. Among the reasons given were the disruptive effect upon the child, the lack of stability, and the potential

15

educational problems with changing schools. *Colvin, supra; see also Evans v. Lungrin,* 97-0541 (La. 2/6/98), 708 So. 2d 731; *Alexander v. Alexander*, 02-683 (La. App. 3 Cir. 11/13/02), 831 So. 2d 1060; *Stanley v. Stanley*, 592 So. 2d 862 (La. App. 3 Cir. 1991), *writ denied*, 592 So. 2d 1339 (La. 1992); *Swope v. Swope*, 521 So. 2d 656 (La. App. 1 Cir. 1988); *Hull v. Hull*, 499 So. 2d 1037 (La. App. 3 Cir. 1986).

We agree with the trial court's finding that joint custody is in the best interest of B.T. Although we understand that the trial court was trying to give each parent ample and equal amounts of time with the child before she begins kindergarten, Louisiana courts have held that this type of arrangement has the potential of causing a substantial disruption in her future educational and social development. Although B.T. has not yet started kindergarten, that day is fast approaching. Additionally, the cultures between the two homes are substantially different given that one is in Miami and primarily Spanish-speaking while the other is in Sarepta and English-speaking.[4] We respectfully vacate the trial court's judgment awarding each parent six-month visitation periods and remand for the rendering of a joint custody implementation order consistent with the views expressed herein.

The trial court judgment states that the parents will share joint custody of B.T. but does not name a domiciliary parent. Louisiana Revised Statute 9:335(B) provides for only two circumstances in which a court may decline to name a domiciliary parent in a joint custody context, that is, when "there is an implementation order to the contrary or for other good cause shown." *Bailey v. Bailey*, 16-0212 (La. App. 1 Cir. 6/3/16), 196 So. 3d 96, *writ denied*, 16-

---

[4] There was much discussion at trial about the language to which B.T. was primarily exposed in both Miami and Sarepta. We applaud the trial court for ensuring the child be raised bilingual in order to communicate with all of her family.

1426 (La. 8/2/16), 196 So. 3d 605. The trial court did an excellent job in weighing the Article 134 factors as required by law. However, because the trial court did not provide an implementation order, name a domiciliary parent, or find good cause for not naming a domiciliary parent, we respectfully find that the trial court abused its discretion as to this portion of the ruling. Therefore, we are required to remand for the trial court to designate a domiciliary parent.

Mr. Tripp also asserts that the trial court erred in denying his motion for new trial. Because we are vacating the trial court's judgment and remanding for further proceedings, this argument is now moot.

## CONCLUSION

For the above reasons, we affirm the trial court's determination of joint custody between the parents. We vacate the portion of the judgment setting forth the rotating six-month visitation schedule. This matter is remanded to the trial court to confect a joint custody implementation order and name a domiciliary parent in accordance with the provisions of La. R.S. 9:335 and any necessary further proceedings consistent with the views expressed herein. The costs of this appeal are assessed equally between the parties.

**AFFIRMED IN PART; VACATED IN PART; AND REMANDED WITH INSTRUCTIONS.**

17